# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

UNITED STATES OF AMERICA,

    *ex rel.* [UNDER SEAL]

      *Plaintiffs,*

v.

[UNDER SEAL]

    *Defendant.*

**Case No. 20-489-RGA [UNDER SEAL]**

**FIRST AMENDED Complaint for Violations of the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.*, the Family and Medical Leave Act, 29 U.S.C. § 2615, and the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.*

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2)**

**JURY DEMAND**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

UNITED STATES OF AMERICA

EX REL. DANIELLE DUNCAN

    3612 Horace Avenue
    Keller, Texas 76244

    *Plaintiffs*,

v.

MR. COOPER GROUP INC.

    8950 Cypress Waters Boulevard
    Coppell, TX 75019

    Registered Agent:

    CORPORATION SERVICE COMPANY
    251 Little Falls Drive
    Wilmington, DE 19808

    *Defendant.*

Case No. **20-489-RGA [UNDER SEAL]**

**FIRST AMENDED Complaint for Violations of the Federal False Claims Act, 31 U.S.C. § 3729, *et seq.*, the Family and Medical Leave Act, 29 U.S.C. § 2615, and the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq*.**

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2)**

**JURY DEMAND**

## FIRST AMENDED CIVIL COMPLAINT

### INTRODUCTION

1.    *Qui tam* Relator Danielle Duncan ("Duncan"), by and through counsel,

individually and on behalf of the United Stated of America files this First Amended Complaint

*QUI TAM* FIRST AMENDED COMPLAINT FILED UNDER SEAL
*United States of America ex rel. Danielle Duncan v. Mr. Cooper Group Inc.*

1

against Defendant Mr. Cooper Group Inc. ("Mr. Cooper") to recover damages, penalties, and attorneys' fees for violations of the False Claims Act, 31 U.S.C. § 3729, *et seq.*("FCA" or "False Claims Act"). Duncan also seeks damages and attorneys' fees for unlawful retaliation in violation of 31 U.S.C. § 3730(h), the Family and Medical Leave Act 29 U.S.C. § 2615, and the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq*.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331.

3.      This Court has personal jurisdiction over Mr. Cooper pursuant to 31 U.S.C. § 3732(a) because Mr. Cooper is incorporated within this judicial district and Mr. Cooper conducts business within this judicial district.

4.      Venue is proper in this Court under 28 U.S.C. § 1391(c) and 28 U.S.C. 2732(a) because some of the complained illegal acts giving rise to this action occurred within this judicial district and because Mr. Cooper is incorporated within this judicial district.

5.      Duncan administratively exhausted her ADA claims and was issued a Dismissal and Notice of Rights by the EEOC on May 11, 2020.

## THE PARTIES

6.      Danielle Duncan is a citizen of the United States and a resident of Fort Worth, Texas.

7.      Duncan is the "original source" of this information within the meaning of 31 U.S.C. § 3730(e)(4)(B) and states that her knowledge of the information contained herein has not been publicly disclosed.

8.      Duncan began working at Mr. Cooper on or about June 15, 2015.

9.      Mr. Cooper is a Delaware corporation with its principal office located in Coppell, Texas.

10.      Mr. Cooper is a mortgage servicer and lender that provides home loans primarily to single-family residences.

## FACTUAL ALLEGATIONS

### I.      Background

11.      Mr. Cooper offers a variety of mortgage options to prospective homeowners including conventional loans, Federal Housing Administration ("FHA") loans, FHA Streamline loans.

12.      Mr. Cooper has owned another company, Champion Mortgage, since 2007.

13.      Champion Mortgage is a reverse mortgage servicer, primarily of FHA Home Equity Conversion Mortgage ("HECM") loans.

14.      Reverse mortgages are a type of loan for homeowners who are 62 or older and allows homeowners to convert equity in their home into a lump sum payment, line of credit, or scheduled recurring payments.

15.      These loans result in interest accruing on the outstanding loan balance, but no payments are required as reverse mortgages are non-recourse loans.

16.      The primary type of loan that Duncan identified as causing issues was a HECM loan; HECM loans are FHA insured reverse mortgages.

17.      To receive FHA approval to originate or submit claims for payment, a servicer like Mr. Cooper must meet certain eligibility requirements and provide a set of required documents, which ensure compliance with FHA certification.

18.     FHA backed loans ensure that in the event of default, Mr. Cooper will not lose its loan investment; instead, the United States, through the United States Department of Housing and Urban Development ("HUD") will cover a portion of the loss such that the FHA loan system acts as an insurer to the private mortgage lenders.

19.     However, reimbursement is capped at the maximum claim amount ("MCA".)

20.     For example, if the outstanding balance of the loan is $100,000 and the property sells for $60,000, but the MCA is $90,000, Mr. Cooper would only receive $30,000.

21.     The MCA is determined at the origination of each loan.

22.     In 2019, around 625,000 homes faced foreclosure; current data suggests that Delaware currently has one of the highest rates of foreclosures with one out of every 1,470 homes in the state being foreclosed.[1]

a.     **FHA Loans**

23.     The FHA was founded by President Franklin Delano Roosevelt in 1934 as a result of the Great Depression causing a collapse in the number of home loans and home ownership in the United States.

24.     The FHA was incorporated into the HUD in 1965.

25.     The FHA has insured over 35 million properties since its inception, providing millions of families the opportunity to have access to home-buying opportunities.

26.     According to HUD, the "FHA has active insurance on over 8 million single family mortgages, almost 12,000 mortgages for multifamily properties, over 3,700 residential care

---

[1] U.S. Real Estate Trends & Market Info, RealtyTrac, https://www.realtytrac.com/statsandtrends/foreclosuretrends (last visited Jan. 29, 2020).

facilities mortgages; and almost 100 mortgages for hospital facilities. The combined unpaid principal balance in FHA's insurance portfolio is over $1.3 trillion."[2]

27.    FHA insured loans protect lenders from substantial monetary harm by allowing lenders to file a claim with HUD to recover any balance, owed by a borrower, on a defaulted loan.

28.    The FHA does not actually lend money to home buyers or borrowers; the FHA provides a form of insurance to a lender, so the lender's investment is covered in the event an FHA backed loan defaults and the lender's losses are not recovered.

29.    While the loan protects the lender, it is the borrower who pays for the coverage; the coverage payments are then used to fund claims made by lenders.

30.    A Congressional Research Service report from 2019 summarized this process as follows:

> FHA's single-family mortgage insurance program is funded through FHA's Mutual Mortgage Insurance Fund (MMI Fund). Cash flows into the MMI Fund primarily from insurance premiums and proceeds from the sale of foreclosed homes. Cash flows out of the MMI Fund primarily to pay claims to lenders for mortgages that have defaulted.

31.    When a borrower acquires an FHA backed loan, the borrower is required to pay interest back to the loan provider, generally a private corporation, such as Mr. Cooper.

32.    However, an FHA borrower also must pay an Upfront Mortgage Insurance Premium ("UFMIP") and an annual Mortgage Insurance Premium ("MIP").

---

[2] The Federal Housing Administration, HUD, https://www.hud.gov/program_offices/housing/fhahistory (last visited Mar. 20, 2020).

33.    The UFMIP is currently 2% of the total loan amount and is paid at the time of closing.

34.    The annual MIP, despite its name, is paid every month and can range from .45% or 1.5%.

35.    Both the UFMIP and the MIP are used to fund the FHA loan system and this fund is the sum of money that is used to pay back the lender in the event they submit a claim to HUD based on the home in question being sold at a loss to the lender.

36.    There are three scenarios where claims could be fraudulently submitted to HUD:

i.    Assignment to HUD (HUD Claim Type 22): Loans become eligible for assignment to HUD when the outstanding loan balance reaches 98% of the maximum claim amount ("MCA"). The HUD assignments team at Mr. Cooper oversees the claims submission process and upon receiving approval, assigns the loan to HUD. A claim for payment of the loan's MCA is filed at that time. Assignment to HUD is Mr. Cooper's preferred manner of fulfilling servicing obligations and therefore loan eligibility is preserved whenever possible. In addition to the HUD Assignments team, a "Data Recon" team was formed at Mr. Cooper to reconcile any loan level data discrepancies that are identified as assignment nears. Despite this control, a large number of assignments claims are processed with overstated MIP and interest accruals, or other unallowable fees/costs included in the loan balance. The added amounts accrue interest and accelerate growth of the outstanding loan balance to within 98% of the MCA, triggering the assignment process and claim payments on loans,

which are not eligible for reimbursement from HUD, who then pays the claim though it is not eligible for assignment.

ii.     Claims to recover losses related to Foreclosure Sales, Short Sales, REO sales (HUD Claim Types 21, 23, or 24): When a loan defaults and the property is sold for less than the outstanding balance of the loan, HUD will cover the difference between the amount of the sale proceeds and the lesser of either the MCA or the appraisal amount. Like assignment claims, many sold loans have increased loan balances as a result of servicing errors. Tax and Insurance advance errors, missing loss draft funds, improper effective dating of prepayments and default servicing fees above the allowable limits are some of the most common scenarios in which servicing errors cause unpaid loan balances to increase and cause HUD to overpay claims.

iii.    Claims submitted to Fannie Mae ("FNMA") and Ginnie Mae ("GNMA") for unallowable loan advances. When Mr. Cooper makes certain loan advances on behalf of FNMA or GNMA as the investor, the advances are normally recovered by Mr. Cooper by filing a claim for reimbursement. The investor will pay the claim and recover the cost at loan disposal from HUD. If HUD fails to reimburse FNMA or GNMA for the advanced charges, the advance is a loss. In situations where Mr. Cooper advanced funds that were not allowed, the false claim was paid directly by FNMA/GNMA

37.    The issues identified above can lead to a foreclosure; foreclosure starts with a pre-foreclosure, which can result in a notice of default that then provides instructions to homeowners on how to fulfil their payment obligations.

38.    If the homeowner fails to fulfill these obligations, the lender may hold an auction to sell the property that is in default in an effort to recoup some, if not all, of the monies owed to the lender on the property.

39.    The foreclosed home will be auctioned, and an opening bid will be typically set to the outstanding loan balance, plus the unpaid interest accrued, and any additional fees and costs associated with the sale. However, homes are not always sold at auction for this full amount, resulting in some level of loss to the lender.

40.    There are other sales which result in losses to Mr. Cooper.

41.    For example, short sales and third-party sales of real estate owned follow the same process as foreclosures.

42.    Short sales are usually sold by heirs of the property owner for 95% of the current appraisal amount.

43.    Third-party sales occur when the foreclosure bid is won by the servicer and the property is sold at a later date.

44.    Since both short sales and third-party sales result in losses to Mr. Cooper, both result in claims submitted for reimbursement from HUD.

45.    The lender may submit a claim to HUD for payment of the loss incurred by the lender as a result of a property being sold for less than the amount of the outstanding loan balance, which includes the unpaid interest accrued, and any additional fees and costs associated with the sale.

46.     In addition to Foreclosures, Short sales and other sales to 3rd parties, losses are incurred through the assignment of loans to HUD that are ineligible for assignment.

47.     The goal from this system is that lenders will have less apprehension of issuing mortgages to higher risk individuals because the government will cover most losses the lender could face in the event the borrower fails to make payments.

## II.     The False Claims Act

48.     The FCA, 31 U.S.C. §§ 3729–3733 was enacted in 1863 by Congress and provides that any person who knowingly submits false claims to the government is liable for damages plus a penalty for each claim. The FCA has been amended several times.

49.     The FCA imposes liability on any person or entity who knowingly presents or causes to be presented a false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a)(1)(A). Additionally, those who make, use, or cause to be made a false statement or record material to the claim are also liable under the FCA. 31 U.S.C. § 3729(a)(1)(B).

50.     The terms "knowing" and "knowingly" are defined by the statute as a person having actual knowledge of the information, acting in deliberate ignorance of the truth or falsity of the information, or acting in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(a)(3)(B)(4).

51.     The term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property. 31 U.S.C. § 3729(a)(3)(B)(4).

52.     "A False Claims Act violation includes four elements: falsity, causation, knowledge, and materiality" *United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 487 (3d Cir. 2017).

53.     Any person who violates the FCA is liable for civil penalties up to $11,000 per false claim prior to November 2, 2015, as adjusted for inflation, plus three times the amount of damages that the Government sustains as a result of the defendant's actions.  31 U.S.C. § 3729(a).  These civil penalties increase to up to $21,563 per false claim for claims submitted to the Government after November 2, 2016 and including treble damages. 28 C.F.R. § 85.5.

### III.     Statutory Background

54.     A mortgage lender, like Mr. Cooper, is required to post prepayments to customers' accounts as of the day the funds are received.

55.      "Requirements for prompt crediting of home loan payments" requires that "[i]n connection with a consumer credit transaction secured by a consumer's principal dwelling, no servicer shall fail to credit a payment to the consumer's loan account **as of the date of receipt**, **except when a delay in crediting does not result in any charge to the consumer** or in the reporting of negative information to a consumer reporting agency, except as required in subsection (b)." 15 USCA § 1639f (emphasis added).

56.     The "Prohibited acts or practices and certain requirements for credit secured by a dwelling" requires that:

> **No servicer shall fail to credit a periodic payment to the consumer's loan account as of the date of receipt, except when a delay in crediting does not result in any charge to the consumer** or in the reporting of negative information to a consumer reporting agency, or except as provided in paragraph (c)(1)(iii) of this section[3]. A periodic payment, as used in this paragraph (c), is an amount sufficient to cover principal, interest, and escrow (if applicable) for a given billing cycle. A payment qualifies as a

---

[3] Section (iii), referenced in this statue, states that "[i]f a servicer specifies in writing requirements for the consumer to follow in making payments, but accepts a payment that does not conform to the requirements, the servicer shall credit the payment as of five days after receipt." 12 C.F.R. § 1026.36(c)(1)(iii)

periodic payment even if it does not include amounts required to cover late fees, other fees, or non-escrow payments a servicer has advanced on a consumer's behalf.

12 C.F.R. § 1026.36(c)(1)(i) (emphasis added).

57.     Elsewhere, the subsection "Handling prepayments for FHA-insured mortgages closed on or after January 21, 2015" states that "[w]ith respect to FHA-insured mortgages closed on or after January 21, 2015, notwithstanding the terms of the mortgage, the mortgagee shall accept a prepayment at any time and in any amount. The mortgagee shall not require 30 days' advance notice of prepayment, even if the mortgage instrument purports to require such notice. **Monthly interest on the debt must be calculated on the actual unpaid principal balance of the loan as of the date the prepayment is received,** and not as of the next installment due date." 24 CFR § 203.558 (emphasis added).

58.     For FHA-insured mortgages closed before January 21, 2015, a separate subsection states:

> (1) With respect to FHA mortgages insured before August 2, 1985, if a prepayment is offered on other than an installment due date, the mortgagee may refuse to accept the prepayment until the first day of the month following expiration of the 30-day notice period as provided in the mortgage, or may require payment of interest to that date, but only if the mortgagee so advises the mortgagor, in a form approved by the Commissioner, in response to the mortgagor's inquiry, request for payoff figures, or tender of prepayment. If the installment due date (the first day of the month) falls on a nonbusiness day, the mortgagor's notice of intention to prepay or the prepayment shall be timely if received on the next business day.

> (2) With respect to FHA mortgages insured on or after August 2, 1985, but closed before January 21, 2015, the mortgagee shall not require 30 days' advance notice of prepayment, even if the mortgage instrument purports to require such notice. If the prepayment is offered on other than an installment due date, the mortgagee may refuse to accept the prepayment until the next

installment due date (the first day of the month), or may require payment of interest to that date, but only if the mortgagee so advises the mortgagor, in a form approved by the Commissioner, in response to the mortgagor's inquiry, request for payoff figures, or tender of prepayment.

(3) If the mortgagee fails to meet the full disclosure requirements of paragraphs (b)(1) and (b)(2) of this section, the mortgagee may be subject to forfeiture of that portion of the interest collected for the period beyond the date that prepayment in full was received and to such other actions as are provided in part 25 of this title.

## IV.    Factual Overview

### a.    Duncan's role at Mr. Cooper

59.    Duncan began working in the mortgage servicing industry in 1997 with Nations Credit.

60.    In 2015, Duncan began working at Mr. Cooper's predecessor, Nationstar Mortgage LLC ("Nationstar Mortgage").

61.    Nationstar Mortgage rebranded and changed its name to Mr. Cooper in or around 2017.

62.    When Duncan started on the Adjustments team at Nationstar, Duncan shadowed different team members. Duncan watched them complete processes and took notes.

63.    However, beyond shadowing, Nationstar did not have a training department or team.

64.    Duncan's background was in mortgage servicing, such as special loans and cash management, so Duncan was familiar with interest calculations and other basic servicing functions.

65. When Duncan was promoted from the Adjustments team to Senior Account Services Analyst on the newly formed Reverse Cash team, in or around February 6, 2017, Duncan was given a hard copy of HUD HECM handbook 4235.1, access to the reverse bank accounts on Chase, a technical manual for CHIP, and workflows/training materials started by Reverse Cash manager Krista Moore ("Moore").

66. Duncan was given the quality control templates used in forward servicing operations to see which quality control tests Nationstar could replicate for the Champion reverse loan portfolio as well as the FLOD ("First Line of Defense") test results for Celink, the subservicer used by Nationstar at that time.

67. Duncan shadowed Moore and attended meetings with other reverse lines of business, IT, and Celink.

68. As Lynnette Anderson ("Anderson"), an Assistant Vice President, and Moore filled the last of the open cash processing positions in 2017, Duncan noticed that the team collectively had little experience with cash and sometimes struggled with cash concepts.

69. Duncan hosted a "lunch & learn" to provide additional training and answer questions, but processing errors remained common.

70. As a senior analyst on Mr. Cooper's reverse cash team, Duncan's role entailed aligning Mr. Cooper's process with policies related to cash management for reverse mortgages.

71. Duncan now reported to Moore, and Duncan's second line supervisor was still Anderson.

72.     Duncan is aware that Mr. Cooper offers FHA backed loans, a fact which is confirmed through an evaluation of Mr. Cooper's website.[4]

73.     As a result of Duncan's role on the reverse cash, Duncan had access and an intricate knowledge of a system called CHIPPER ("CHIP") where all of Mr. Cooper's reverse loans were processed; forward loans were processed on a different system called LSAMS.

74.     The CHIP system is how Mr. Cooper manages its reverse mortgage loan servicing.

75.     CHIP is the servicing system of record, which means CHIP contains all loan information, historical data, payments and disbursements made on a loan, servicing comments, etc. It is the repository of all loan information.

76.     The data populated in CHIP is pulled from a database called RODS, through SQL data processing software, which stores the data input daily by loan processors.

77.     Every department within the Reverse team uses CHIP such as Cash, Default, Claims, Foreclosure, Support Ops, Data Recon.

78.     Duncan noticed that Mr. Cooper was incorrectly recording prepayments borrowers were making to Mr. Cooper, as well as all other funds received to credit loan balances such as refunds of tax disbursements, loss draft funds, funds administered by bankruptcy trustees, hardest hit funds, and funds received from prior servicers. The sources of incoming funds included bank wires, checks and Western Union.

**b.  Mr. Cooper's Process**

79.     Mr. Cooper calculates interest charged to loans daily.

---

[4] Types of Home Loans, Mr. Cooper, https://www.mrcooper.com/loans/types. (last visited Feb. 12, 2020).

80.    Interest is calculated within CHIP based on data fields stored in ODS for each loan. Some data fields are input by processors, i.e. the effective date of a prepayment transaction and others are more static, i.e. current interest rate on a given loan.

81.    The calculations that the system makes are not flawed numerically, but have been restricted by Mr. Cooper's programmers so that prepayment transactions cannot be cancelled or reversed in order to modify or correct an existing transaction unless it is the most recent record in a loan's transaction history.

82.    The interest calculations CHIP performs have also been limited to two days, and only within the same month. Duncan was told as part of her training that this is related to Federal National Mortgage Association month end reporting requirements.

83.    Duncan was also told by Lynnette Anderson, Krista Moore and Michael Kresson, VP of Reverse, that prepayments also cannot be backdated over month end, but no further explanation was given. If a prepayment was physically received on January 31 and the processor is posting it on February 1, the effective date 1/31 cannot be used and a manual calculation of MIP and interest credit for the one day is used.

84.    All funds applied to a loan either two or more days after receipt, or the day after receipt on month end, will require a manual calculation of MIP and interest so that these amounts can be refunded to the loan.

85.    To accomplish this manual calculation for a vast amount of loans at once, and because the loan processors were not taught how to calculate interest, an excel spreadsheet was created by a member of the Reverse Cash team, Zach Kraft ("Kraft").

86.     Kraft also had no experience with reverse cash but did have some knowledge of the SQL programming language, which he used to pull in data from CHIP to excel to perform MIP and interest calculations.

87.     Kraft's spreadsheet was not protected from being altered by anyone who used it and the spreadsheet was unable to account for monthly interest rate adjustments, so the interest rate used in the calculations was frequently incorrect.

88.     This spreadsheet is the only way the reverse cash team determined how much mip and interest to credit to hundreds, if not thousands, of loans each day based on the checks and wires received from borrowers.

89.     Checks are retrieved from Mr. Cooper's mailroom and brought to the cashroom for processing two or three times a day.

90.     The checks are scanned into an imaging system called iCash and the checks are supposed to be applied the same day that they are scanned in to iCash.

91.     One reoccurring problem was that a one-day or even two-day delay occurred between when the checks were received and when they were scanned, but the processors were directed to post them as if they were applying the day of receipt.

92.     This created one or more days of invalid interest accrual on an entire day's worth of check transactions.

93.     Whenever Duncan identified that this posting delay had occurred it was not remediated for all transactions affected, only the loan that had failed Duncan's QC test, which sampled only 10% of each day's prepayment transactions.

94.     After the check images are scanned into iCash, the physical checks are prepared and deposited into the reverse payment clearing account at Chase bank.

95. The check images are sorted into different queues- autopost, miscellaneous, support operations, bankruptcy, etcetera and the funds were processed according to the queue.

    a)      Autoposts were bulk uploaded without manually reviewing.

    b)      Support ops, bankruptcy, etcetera would be entered into spreadsheets and sent to the line of business for posting instructions.

96. Once the posting instructions were received back, the funds would be posted. Many times this would be the next day, or days later, without being effective dated properly by the processor.

97. Furthermore, some checks were returned with little attempt to locate the loan in CHIP if a loan number was not provided or forwarded to another servicer or a third party due to the misidentification.

98. This also occurred when there was a lack of policy guidance when exceptions occurred, such as whether or not Mr. Cooper could endorse checks made payable to prior servicer Wells Fargo.

99. Wires are received in real time throughout the day and are processed into the Chase payment clearing account ("PCA").

100. From Duncan's first few weeks on the Reverse Cash team in February 2017, Duncan located the wire detail reports in Chase and showed her manager, Moore, how to access the information to ensure timely posting.

101. Duncan built a report in Chase that Duncan delivered to Moore's inbox daily that included every wire received the previous day.

102. Mr. Cooper's policies required this report to be saved to a shared account services folder to preserve a record of all wires received.

103.    This report was completely ignored, and nothing was saved until about six months later in August or September 2017, after numerous FLOD ("First Line of Defense") fails.

104.    Instead the wire process was delegated to the Investor Reporting department who would import wire detail into spreadsheets, remove the time and date received data, and forward to Reverse Cash to apply per their instructions.

105.    Also, the last Investor Reporting employee that pulled wire detail from Chase would leave at 4:00 pm CST and therefore deem all wires received after 4:00pm CST to be "after cutoff" and post effective the following day.

106.    All wires received from 4:00pm to 5:00pm CST were incorrectly held an extra day even though Reverse Cash was aware of the posting requirement.

107.    For instance, if a payment is posted the day after it is submitted, this results in one day's worth of interest accruing on the loan; if a payment is posted ten days after it is submitted, this will result in ten days' worth of interest accruing on the loan.

108.    Mr. Cooper's CHIP system improperly posts payments one or more days after payment is received by Mr. Cooper.

109.    For FHA loans, this only negatively affects the borrower.

110.    However, in the event of a foreclosure, the United States oversees the process of taking possession of the borrower's property and auctioning it off to recover whatever revenue possible.

111.    In the event the lender is still not made whole from the foreclosure and auction, the lender can submit a request to the FHA to receive a portion of the loan balance that the foreclosure it did not recover.

112.    HUD uses a system called Home Equity Reverse Mortgage Information Technology ("HERMIT") to monitor the servicing activity of HECM loans.

113.    The HUD Assignments team and a Data Recon team are responsible for reconciling the servicing information in the HERMIT system with the information in CHIP and ensuring that the data is accurate..

114.    By design, the Data Recon team is supposed to ensure loans do not have any defects, but in practice, this team just works to make the balances match HERMIT information.

### c.   Duncan learns of problematic systems at Mr. Cooper

115.    Mr. Cooper's CHIP system lacked the capacity to handle mortgage servicing effectively and lacked built out functions to manage payoffs and credit interest.

116.    Duncan became alarmed by the impact the inadequate CHIP system was having on consumers and how it created a monetary loss for consumers, and ultimately the government.

117.    Duncan first noticed checks were being posted days after they had been received by Mr. Cooper or the prior service. For example, Homeowner 1's[5] mortgage payment was received by Mr. Cooper's Loan Servicing Department on September 22, 2017 after being forwarded from the prior servicer Celink who had received the check on September 19, 2017.

118.    However, the reverse cash team did not honor the prior servicer's date stamp of September 19, 2017 as required but instead credited the Homeowner 1's payment to the CHIP system as of September 22, 2017. This resulted in three days of improper interest accruing on Homeowner 1's mortgage.

---

[5] The names of the Homeowners discussed in this Complaint are known to the Relator and can be made available to the Court, the Government, and the Defendant as necessary.



119.    Homeowner 2's mortgage payment was received by Mr. Cooper's Loan Servicing

Department on September 21, 2017 via overnight mail from prior servicer Celink, who received

the check September 18, 2017.  However, Mr. Cooper did not post Homeowner 2's payment to

the CHIP system until four days later, on September 22, 2017. This resulted in four days of

improper interest accruing on Homeowner 2's mortgage.



120.    Duncan alerted her team to this issue via email in September 2017. In her email,
Duncan notified Kraft, Daniel Peterson, Debi Hawkins, Angelica Martinez, Wanda Bullock,
Jessica Moore, Robert Young, Stacy Paredes, Michelle Chatmon, Kristin Harris, Shayne Lehnen,
Moore, and Anderson that "Funds forwarded from a prior servicer will always need to be
effective dated to the date of receipt by the prior servicer."



121.    Duncan's supervisor, and the Reverse Cash manager, Moore, sent an email in
October 2017 to clarify a policy related to wire cutoffs and confirmed that "it is critical that [Mr.
Cooper] start doing this TODAY." (emphasis in original).

From: Krista Moore
Sent: Thursday, October 12, 2017 6:13:15 AM
To: Jessica Moore; Daniel Peterson; Shayne Lehnen
Cc: Danielle Duncan; Wanda Bullock; Angelica Martinez; Lynnette Anderson
Subject: REDLINE: After Cutoff Effective-Date

Yesterday, FLOD informed us that wires received "After Cutoff" MUST be effective-dated to the day received (previous business day) UNLESS the wire was received AFTER 5pm. Since we don't have timestamps on the wires, ALL "After Cutoff" wires must be effective-dated to the previous business day. It is critical that we start doing this TODAY. Let me know if you have any questions.

Danielle/Wanda/Angelica- this will change your QCs

Thank you.

KRISTA MOORE
*Manager- Reverse Account Services*

122.     Duncan's colleague, Daniel Peterson, followed up and asked about accounts from prior months to see if MIP and interest should be added back to the accounts that were charged as "After Cutoff."

123.     Anderson, Assistant Vice President for Account Services Operations, replied and stated that this would be a rule that would be followed "going forward."

| From: | Lynnette Anderson <Lynnette.Anderson@mrcooper.com> |
|---|---|
| Sent: | Thursday, October 12, 2017 10:26 AM |
| To: | Daniel Peterson <Daniel.Peterson@championmortgage.com>; Krista Moore <Krista.Moore@championmortgage.com>; Jessica Moore <Jessica.Moore@championmortgage.com>; Shayne Lehnen <Shayne.Lehnen@championmortgage.com> |
| Cc: | Danielle Duncan <Danielle.Duncan@championmortgage.com>; Wanda Bullock <Wanda.Bullock@championmortgage.com>; Angelica Martinez <Angelica.Martinez@championmortgage.com> |
| Subject: | Re: REDLINE: After Cutoff Effective-Date |

No we told the going forward we would follow that rule. When she pulls it in the morning is there ever wires for that morning with wires from prior day? We don't want to backdate those
Thanks

Get Outlook for iOS

From: Daniel Peterson
Sent: Thursday, October 12, 2017 9:15:50 AM
To: Lynnette Anderson; Krista Moore; Jessica Moore; Shayne Lehnen
Cc: Danielle Duncan; Wanda Bullock; Angelica Martinez
Subject: RE: REDLINE: After Cutoff Effective-Date

Yes. She pulls a 4pm PCA and then anything after 4 pm has been considered "After Cutoff" because no one is here to pull Trims after 4. When she does pull, there isn't a time stamp that says when the wire came in, only when the report was pulled. So, I'll just start backdating anything that came in for that day.

Do I need to go back, for the month of October, and add MIP and Interest to those accounts that were considered "After Cutoff" up to this point?

124.     As of September 2017, Mr. Cooper was aware that it was improperly inflating loan amounts by failing to promptly post payments as required by law resulting in improper accrual of MIP and interest on loans.

125.    As of October 12, 2017, Mr. Cooper directed its staff to not retroactively fix the illegal MIP and interest accruals.

126.    Duncan continued to notice issues within the CHIP system that caused confusion among colleagues who then assessed improper amounts of MIP/interest to consumer accounts due to Duncan's colleagues' confusion.

127.    Mr. Cooper's improper recording practices results in mortgage miscalculations and creates artificially, and incorrectly, high mortgage balances due to improper interest being charged to borrowers' accounts.

128.    Duncan repeatedly followed up with management, raising concerns over interest calculations errors and the impact to loan balances, causing Moore and Anderson to direct Duncan not to raise her concerns via email because Moore and Anderson did not want Duncan to alert the FLOD team that errors were occurring.

129.    Moore and Anderson wanted to resolve the issues prior to FLOD discovering the issues but after a month of waiting, and no resolutions occurring, Duncan sent an email to Moore to put her concerns into writing.



**From:** Danielle Duncan
**Sent:** Wednesday, October 18, 2017 12:53:28 PM
**To:** Krista Moore
**Subject:** RE: Date stamp question

Address in Michigan looks like Celink. If so, will have to start honoring 1st stamp effective date and decide how to handle the previous checks?

**From:** Krista Moore
**Sent:** Wednesday, October 18, 2017 11:09 AM
**To:** Danielle Duncan <Danielle.Duncan@nationstarmail.com>
**Subject:** Re: Date stamp question

I believe Wells Fargo. I will send my manifest once I get back

**From:** Danielle Duncan
**Sent:** Wednesday, October 18, 2017 10:52:44 AM
**To:** Krista Moore
**Subject:** Date stamp question

Krista,

Do you know who stamped this originally on the 10th? Loan Admin or lockbox, etc?



130.    Duncan's second line supervisor, Anderson, asked Michael Kressin ("Kressin"), Vice President Reverse at Champion Mortgage,[6] "when [Mr. Cooper has] a payment that comes in and [Mr. Cooper] need to add mip and interest because it did not get posted at month end do we calc[ulate] the mip and interest on the upb or on the dollar amount to the payment."

---

[6] *Supra* paragraph 11.

From: Lynnette Anderson
Sent: Tuesday, December 12, 2017 4:37 PM
To: Michael Kressin <Michael.Kressin@championmortgage.com>
Subject: Question

Ok I have looked and googled etc but need to know the below:

When we have a payment that comes in and we need to add mip and interest because it did not get posted
at month end do we calc the mip and interest on the upb or on the dollar amount to the payment?

LYNNETTE ANDERSON

A V P  A c c o u n t  S e r v i c e s

Servicing -Cash

131.    Kressin responded and confirmed that if a payment is posted later than the date it
was received, the incorrectly charged interest should be manually posted to the customer's
account to cover this improper charge.

From: Lynnette Anderson
Sent: Wednesday, December 13, 2017 8:14 AM
To: Krista Moore <Krista.Moore@championmortgage.com>; Danielle Duncan <Danielle.Duncan@
championmortgage.com>
Cc: Margaret Titus <Margaret.Titus@mrcooper.com>; Martha Jackson <Martha.Jackson@mrcooper.com>
Subject: FW: Question


There was some confusion around MIP/Interest calculation when a repayment etc is not processed and we
have to effective date. Wanted to clarify that it is calc on payment not UPB.

Thanks


_____

From: Michael Kressin
Sent: Tuesday, December 12, 2017 5:22 PM
To: Lynnette Anderson <Lynnette.Anderson@mrcooper.com>
Subject: RE: Question


You would determine the daily MIP and daily Interest on the amount of the payment for the number of days
it was not posted . The reason is the UPB should have been reduced for that time period and the loan
needs to have the credit.


Example: payment $100.00 daily MIP/Interest is $1.00 and the payment was should have been posted 20
days ago, you would apply $100, then a second transaction for $20 ($1.00 X 20 days).


132.    Duncan reported her concerns about the issues in the reverse mortgage processing

department, which led to monetary losses to consumers and potentially financial impact to the

Government, to Mr. Cooper's Human Resources Department, specifically an individual named

Nichole Moseley ("Moseley") in or around December 2017. Moseley referred Duncan to Mr.

Cooper's legal department in December 2017.

133.    In December 2017, Duncan met with the VP and Associate General Counsel,

LeAllen Frost ("Frost"), and Mr. Cooper's outside counsel from Womble Bond Dickinson.

134.    At the December 2017 meeting, Duncan reported her concerns related to check

transaction issues and improper MIP/interest rate accruals.

135.    Duncan downloaded an entire day's worth of check transactions from Mr. Cooper's Chase bank account with images of the checks.

136.    This download consisted of over 50 checks, and Duncan brought the hard copies of the images to this meeting and gave them to Frost to show how this issue was persistent and pervasive throughout Mr. Cooper's check processing.

137.    During the December 2017 meeting Frost assured Duncan that her concerns would be looked into and reviewed.[7]

138.    During Duncan's subsequent conversations with Frost in early 2018, Frost told Duncan to be patient and that Duncan's concerns were under review.

139.    Duncan began digging deeper into the issues present at Mr. Cooper.

140.    Duncan continued to review documents she retained and was able to identify numerous instances of interest being improperly charged to consumers, even after Mr. Cooper was on notice of the illegal practices and allegedly corrected the issue.

141.    Duncan understood the fraudulent activity to work as follows.

### d.  <u>**Example of how the fraud works through a hypothetical**</u>

142.    Customer A has an FHA insured mortgage for $100,000 on her home with a standard annual interest rate.

143.    Customer A submits a payment to Mr. Cooper at 4:30pm on a Monday; however, due to human and technological delays, Mr. Cooper posts this payment to Customer A's account on Thursday.

---

[7] *See infra* paragraph 190 and subsequent paragraphs (describing Duncan's efforts to alert Mr. Cooper to its fraudulent business practices).

144.    Since interest accrues daily, Customer A will be charged three extra days of accrued interest on her account.

145.    In this hypothetical, we can imagine Customer A would accrue $20 of improperly calculated interest due to the three-day delay.

146.    This occurs for a few months, and months later, Customer A's home goes into foreclosure and is auctioned off so that Mr. Cooper can recover the money it alleges it is owed.

147.    Mr. Cooper recovers the majority of the money it alleges it is owed, but not all; this delta, between what Mr. Cooper recovered and what it alleges it is owed, will be submitted to the FHA which will cover the difference and includes the $20 of improperly charged interest.

148.    Thus, this request to the FHA has been "poisoned" by the CHIP system and human error that has been artificially accruing interest beyond what the consumer owes, in this example $20.

149.    This is improper because Mr. Cooper is an FHA-approved lender.

150.    In order to become an FHA-approved lender, a company must complete an online application and complete required documents as well as continue to meet eligibility requirements in accordance with the Single-Family Housing Policy Handbook.

151.    This handbook states that "The Mortgagee must calculate the interest as of the date the prepayment is received, not as of the next Installment Due Date."

152.    This handbook also describes the materiality of false certifications to HUD by noting that "[i]f a Mortgagee submits a false certification to FHA, the Mortgagee and its certifying Corporate Officer may be referred for criminal, civil, or administrative actions, as appropriate."

153.    Furthermore, to submit a claim to HUD, Mr. Cooper must submit Form HUD-27011 that includes a certification stating the following:

**Certification:** The undersigned agrees that in the event of damage by fire (except as otherwise provided in section 203.379(b) of the HUD regulations; flood, earthquake, tornado, or boiler explosion, if applicable, the Secretary may deduct from the settlement to be made to the mortgagee an amount computed in accordance with the applicable HUD regulations. For conveyance claims, the undersigned further agrees: (1) that in the event the Secretary finds it necessary to reconvey the above described property to the mortgagee, because of the mortgagee's noncompliance with HUD regulations, the mortgagee shall reimburse the Secretary for any settlement made in debentures and/or cash and for all cash disbursements, including those for repairs and rehabilitation of the property, made by the Secretary; and (2) that if a mortgagee does not comply with HUD regulations, the mortgagee remains responsible for the property, and any loss or damage thereto, notwithstanding the filing of the deed to the Secretary for record, and such responsibility is retained by the mortgagee until HUD regulations have been fully complied with (203.379).
For HECM claims, the undersigned hereby certifies under the penalty of perjury that the foregoing is true and correct: 1) the mortgage is prior to all mechanics' and materialmen's liens filed of record, regardless of when shuch liens attach, and prior to all liens and encumbrances, or defects whic may arise except such liens or other matters as may have been approved by the Commissioner; 2) the amount stated in the instrument of assignment is actually due and owing under the mortgage: and 3) there are no offsets or counterclaims thereto and the mortgagee has a good right to assign.
**Warning:** HUD will prosecute false claims and statements. Conviction may result in criminal and/or civil penalties. (18 U.S.C. 1001, 1010, 1012; 31 U.S.C. 3729, 3802)
**By signing below, the undersigned certifies upenalty of perjury that the statements and information contained hereon (face and reverse) are true and correct.**

| 35. Name & address of mortgagee (include Zip Code) | 36. Name & address of Mortgagee's servicer (include Zip Code) |
|---|---|
| 37. Mortgagee official signature, date & title. (Signature not necessary if signed by (Servicer) | 38. Servicer signature, date & title. |

Please see HUD Handbook 4000.1, FHA Single Family Housing Policy Handbook for submission instructions for forward mortgage insurance claims.

154.    Claims are submitted through HERMIT, which also includes the following certification:



155.

156.    The artificially accrued interest is improperly submitted to HUD and falsely certified as being true and correct.

157.    While this interest scheme predominantly affects borrowers, it also impacts the government whenever FHA insured home loans are foreclosed.

158.    On or around August 1, 2019, Duncan was constructively discharged from Mr. Cooper due to increased scrutiny and decreased job responsibilities as a result of her efforts to raise awareness of her concerns and her medical related leave.

**IV.    Duncan takes Protected Medical Leave**

159.    In or around February 2017, Duncan was involved in a serious home accident.

160.    Duncan informed Mr. Cooper of this accident as soon as Duncan possibly could, from her hospital bed.

161.     As a result, Duncan was forced to spend substantial time, approximately two months, away from Mr. Cooper on FMLA leave.

162.    In April 2017, Duncan had knee surgery to repair her meniscus and anterior cruciate ligament.

163.    Duncan returned to Mr. Cooper on or around May 10, 2017.

164.    When Duncan returned to work, Duncan continued to take intermittent FMLA leave.

165.    Additionally, upon returning to work, Duncan put Mr. Cooper on notice of certain physical restrictions such as walking up and down the stairs and carry heavy boxes.

166.    When Duncan returned to Mr. Cooper from her medical leave, she learned Mr. Cooper had hired five (5) new people for her team.

167.    Also upon Duncan's return, Moore and Anderson moved Duncan out of her senior role to a more junior role.

168.    Further, Anderson moved Duncan to a cubicle, isolated from the other six team members, and Duncan was not kept updated on the work of the six team members.

**V.    Duncan is Retaliated Against**

169.    Due to Duncan's managers, Moore and Anderson, demoting Duncan to a non-managerial role, and the isolation Duncan felt, Duncan requested a meeting in or around mid-May 2017 with Moore and Anderson to address her concern that she was demoted, isolated, and otherwise being retaliated against since returning from medical leave.

170.    At the meeting, on or about May 30, 2017, Anderson told Duncan that Duncan would not be getting her original job back. Anderson also told Duncan that Mr. Cooper had "moved on" and Duncan wasn't needed in the Senior Analyst role anymore.

171.    Anderson stated that "we can't have you limping around to FLOD meetings" at Mr. Cooper, a direct reference to Duncan's injury.

172.    Duncan did walk with a limp at the time and wore a brace on her knee, Duncan also sometimes needed to use crutches to get around at the office. Duncan's limp, knee brace, and use of crutches were all a result of her injury and subsequent surgery for which she took FMLA leave and for which she requested reasonable accommodations upon her return to the office.

173.    Two days after Duncan's meeting with Anderson and Moore, on or about May 30, 2017, Anderson pulled Duncan into the office of Jessica Keller ("Keller"), from Human Resources.

174.    Keller gave Duncan a verbal and written warning, with Anderson present, where Keller made baseless accusations against Duncan.

175.    This was the first time Duncan had ever been issued a disciplinary notice in all Duncan's time at Mr. Cooper.

176.    Keller accused Duncan of trying to solicit drugs from a co-worker and alleged Duncan had made processing errors that could have affected loans. These allegations were untrue, and Duncan disputed the allegations.

177.    Soon after, on or about June 1, 2017, Duncan filed an internal hotline complaint with Mr. Cooper's internal hotline service, alleging that Duncan was being discriminated and retaliated against since returning to Mr. Cooper.

178.    Duncan followed up via email with Keller on June 5, 2017.

| | |
|---|---|
| **From:** | Danielle Duncan <Danielle.Duncan@championmortgage.com> |
| **Sent:** | Monday, June 5, 2017 10:58 AM |
| **To:** | Jessica Keller <Jessica.Keller@mrcooper.com> |
| **Subject:** | RE: HR Investigation into Misconduct and Warning memo |

Thank you very much.

**From:** Jessica Keller
**Sent:** Monday, June 05, 2017 9:34 AM
**To:** Danielle Duncan <Danielle.Duncan@nationstarmail.com>
**Subject:** Re: HR Investigation into Misconduct and Warning memo
Danielle,

I will set up a meeting with HR legal, Nichole Moseley as soon as possible.

Thank you
Jessica Keller

Get Outlook for Android

**From:** Danielle Duncan
**Sent:** Monday, June 5, 2017 9:23:02 AM
**To:** Jessica Keller
**Subject:** HR Investigation into Misconduct and Warning memo
Good morning Jessica,
I would like to meet with you or the appropriate party in HR to discuss the findings and the correct procedure for submitting a formal dispute as well as filing a complaint. I would like to meet as soon as possible so as to be sure I have all necessary documentation submitted as expediently as possible.
Thank you,

179.     During this time, Duncan also had a meeting and reported to HR, through Mosely, about the discrimination Duncan experienced and that Duncan was subject to harassment since returning from medical leave with reasonable accommodations. Duncan alerted Mosely that Duncan intended to contact the EEOC regarding Mr. Cooper's treatment of her.

180.     Shortly thereafter, in or around June 15, 2017, HR completed its alleged investigation into Duncan's report of discrimination and retaliation for Duncan's medical leave and perceived physical disabilities.

181.     As a result of the investigation, HR restored all Duncan's former job duties, removed the drug solicitation accusation and negative performance accusations from Duncan's record, and Duncan received an apology from Moore and Anderson.

182.     Moore and Anderson told Duncan they were under pressure from HR to find performance problems in support of the drug solicitation claim.

183.     However, after these confrontations, Duncan was still isolated, and colleagues told Duncan they could not and would not talk to her because they were uncomfortable being seen with her and did not want to get in trouble with Anderson.

184.     Duncan believes that this was because management made it known that they were upset that Duncan had filed an HR complaint for discrimination and harassment based on Duncan's medical leave perceived disability; further Duncan believes this was related to Duncan's efforts to raise awareness about borrowers being improperly charged for misprocessed payments on the borrowers' accounts.

185.     In or around August 2017, Moore informed Duncan that Duncan's title had been changed to Quality Control Senior Associate position.

186.    Moore explained this was a title realignment; however, Duncan's position was again much lower than the role Duncan had held prior to Duncan's medical leave and the position which Duncan was returned to after Duncan filed her HR complaint.

187.    Meanwhile, people in lower tiered roles were given higher titles than Duncan.

188.    Duncan's newly assigned Quality Control Senior Associate position reported to a different manager, Martha Jackson ("Jackson") and Margaret Titus ("Titus"), AVP, and cut off from Duncan's previous team.

189.    Duncan's role prior to her medical leave was a management role and the role Moore placed Duncan in was a non-management position.

190.    Prior to Duncan's medical leave, Duncan had numerous positive performance reviews and "Showcase" recognition awards from management.

191.    Furthermore, Duncan's role prior to Duncan's medical leave would have offered Duncan a higher salary cap; however, the role of Quality Control Senior Associate had a lower cap, and limited Duncan's earning potential and financial upward mobility.

192.    On or around December 3, 2017, Duncan again contacted Moseley of Human Resources and notified Moseley of the demotion and the continued harassment and retaliation.

193.    Duncan expressed her concerns related to harassment and retaliation via email:



**EEOC and other violations**

1 message

| | |
|---|---|
| **Danielle Duncan** <Danielle.Duncan@championmortgage.com> | Thu, Dec 14, 2017 at 3:58 PM |
| To: Nichole Moseley <Nichole.Moseley@mrcooper.com> | |
| Cc: Danielle Duncan <Danielle.Duncan@championmortgage.com> | |

Hello Nichole,

It's difficult to have to send this follow up to the discrimination matter I thought was resolved this past summer. I reported to Krista Moore up to Lynnette Anderson and Stella Hess at the time. As a result of your involvement and investigation surrounding the harassment and retaliation I suffered after returning from short term disability, my job responsibilities were restored, disciplinary action removed and my Manager and AVP both apologized.

As the matter was resolved, I was told to reach out to you if there were further instances. I should have sent this earlier but I've tried very hard to give Lynnette the benefit of the doubt with each incident, working harder and harder until I am now physically ill and emotionally drained. It is a horrible work environment. I've included some of the details in the hope that you can provide assistance:

-My fmla related absences continue to be perceived as a performance issue. I was told again that my knee problems and resulting tardiness are not acceptable (prefaced by "You're probably going to go to HR, but...")

-My job duties have been systematically removed and reassigned without my knowledge, causing confusion and embarrassment when I attempt to complete my perceived tasks within Account Services. FLOD rebuttals were removed first but I attributed it to the need for me to focus on Quality Control and process improvement as well as training and reporting duties at the time.

-My job title was restructured along with everyone else's a few months ago. I assumed I'd be moved into a Senior Analyst title as that is the level of my role in Account Services. I would have understood Analyst I as I'm not privy to the benchmarks considered. I was instead moved to a Sr. Associate position and told that in this way, I would continue to receive overtime pay. The title change was presented as a favor to me. Other, drastically less qualified team members were moved to Analyst II. Later (after removing my job functions and sending me to another team in Account Services) it was explained that I do not fit the description of an Analyst, confirming the demotion.

My attempts to implement process improvements to mitigate glaring compliance violations have been met with hostility and made my situation drastically worse. I've been deemed incompetent and ineffective and received a November scorecard that rates my performance at 58 and productivity 79. I have been undermined, insulted and criticized on a daily basis. I am unable to rest and worry constantly over what I will endure the next day. The unfair, manipulative and discriminatory treatment combined with the ongoing pressure to ignore violations and alter results has had me home with a migraine for 2 days.

------------------------------------------------------

*Danielle Duncan*

*Account Services Analyst*

Nationstar Mortgage

4000 Horizon Way

Irving, TX 75043

Danielle.duncan@nationstarmail.com

O: (972)894.0289 | M: (000) 000.000

www.nationstarmtg.com

194.    On or about December 28, 2017, Mr. Cooper cut off Duncan's door badge access without explanation.

195.    When Duncan asked security about why her access was cut off, Security stated they had no idea why Duncan's door badge access would be cut off and ultimately restored Duncan's access.

196.    Between December 27, 2017 and early January, 2018, auditors moved into the conference room near Duncan's desk to audit the Reverse QC team. While these auditors never spoke directly to Duncan, their presence made her uncomfortable.

197.    Additionally, in late December 2017 and early January 2018, the security presence on Duncan's floor increased. One security guard would stop at Duncan's desk every day around 5:30pm and scan the room before continuing on his rounds.

198.    On March 8, 2018, Duncan's remote login access was permanently revoked.

199.    Also, on March 15, 2018, Duncan received an email from the mailroom email address telling Duncan that she had a package in the mail room to pick up.

200.    Despite Duncan's limited mobility, Duncan walked all the way to the mail room which was down a floor and down a hallway. When Duncan arrived at the mailroom, the clerk informed Duncan that they did not know what Duncan was talking about, and Duncan had no package to pick up.

201.    These actions contributed greatly to Duncan's diagnosed anxiety which Duncan disclosed to Mr. Cooper in March 2018.

202.    For this reason, Duncan requested another meeting with Moseley in Human Resources, on or around March 15, 2018.

203.    Moseley was still investigating Duncan's HR complaint Duncan made in December 2017.

204.    Duncan told Moseley she had a panic attack and that Duncan could not take the harassment any longer.

205.    Moseley was aware of Duncan's health problems, including anxiety and a seizure disorder, through Duncan's disclosures at this March 2018 meeting.

206.    Duncan requested a reasonable accommodation to be moved out of her current department at Mr. Cooper but was told by Moseley that although she agreed it was best Duncan be moved from the department right away, she would have to wait for an open position and apply, no timeframe was given.

207.    Duncan notified her manager and Human Resources representative on March 16, 2018 that Duncan would not be able to go to the office that day due to stress affecting her health and an appointment with a doctor.

208.    After receiving approval from her doctor, Duncan then requested work from home as a reasonable accommodation through Mr. Cooper's leave request portal, UNUM; instead Duncan was placed on unpaid leave for anxiety. After nearly five (5) months of taking unpaid leave, Mr. Cooper approved Duncan's accommodation in or around August 6, 2018.

209.    Duncan was advised by her UNUM ADA specialist, Jason Herod, to request an accommodation for no more than a few months at a time.

210.    Herod told Duncan that Mr. Cooper would not approve a lengthy or undetermined amount of time and she should instead request a few months and then have her doctor extended the leave.

211.    Duncan remained on unpaid leave until August 6, 2018 when the work from home accommodation was approved.

212.    During this time, Duncan attended counseling; Duncan still goes to counseling at least once a week.

213.    After Duncan had successfully worked from home for over six months, Tammy Weyburn ("Weyburn"), AVP of HR, made Duncan use her only remaining PTO days while Duncan's accommodation to work remotely was being considered for reapproval.

214.    This would be normal policy for an FMLA covered leave. At Mr. Cooper an employee can exhaust their PTO first, then be unpaid the rest of the time they are out.

215.    However, this was retaliatory as Mr. Cooper was delaying its decision on Duncan's reasonable accommodation request. Duncan provided Mr. Cooper with all requested information and Mr. Cooper was able to review the information and approve Duncan's request.

216.    Instead, Mr. Cooper chose to delay approval, which caused Duncan to take her last PTO unnecessarily.

217.    Also, during this time, Duncan followed up on the status of her December 2017 protected activity. In response, Moseley stated that the investigation was completed and "to the extent any isolated issues were identified, they were addressed." Despite Moseley's response, Duncan did not believe that the incidents were "isolated" or "addressed."

---

### RE: Internal HR and Legal complaints
1 message

Nichole Moseley <Nichole.Moseley@mrcooper.com>                    Wed, May 2, 2018 at 3:23 PM
To: Danielle Duncan <duncandaniellek@gmail.com>
Cc: Jessica Keller <Jessica.Keller@mrcooper.com>, LeAllen Frost <LeAllen.Frost@mrcooper.com>

Hi, Danielle. It is my understanding that the investigation was completed and, to the extent any isolated issues were identified, they were addressed. We hope your doctor's appointment goes well and look forward to hearing from you after about your plan to return to work.

Best,

Nichole

From: Danielle Duncan [mailto:duncandaniellek@gmail.com]
Sent: Tuesday, May 01, 2018 10:27 AM
To: Nichole Moseley <Nichole.Moseley@mrcooper.com>
Cc: Jessica Keller <Jessica.Keller@mrcooper.com>; LeAllen Frost <LeAllen.Frost@mrcooper.com>
Subject: Internal HR and Legal complaints

Good morning Nichole,

Would you be able to provide me with an update regarding the status of the complaints I made in December 2017? I am currently out on leave and working with my care providers to determine my treatment and return to work plan. Information as to whether or not the investigations were concluded and if so, the results/actions that were taken would be helpful. I have been out of the office since 03/16 and as of that date the investigations were both active (3 months). I have a doctor appointment Thursday, 5/3 and would like to discuss this with my doctor at that time. I appreciate your assistance.

Thank you,

218.    Duncan returned to Mr. Cooper in August 2018 through telework accommodations.

219.    While working from home, Jackson did not invite Duncan to meetings, did not include Duncan on emails, and separated Duncan from all mechanisms which would have allowed Duncan to effectively do her job.

220.    During this time, Jackson was unresponsive and would reverse Duncan's work, delete Duncan's efforts, and then provide Duncan with baseless poor performance reviews.

221.    Furthermore, in a December 3, 2018 email, Duncan expressed her concerns related to the discriminatory and retaliatory environment she was placed in. Duncan reported to her management team that she "manage[d] to maintain a perfect SLA score over the past 3 months despite being subject to rules and restrictions that no other employee on the team has. [She has] been cut off from learning anything new and had all resources needed to complete [her] job removed. [She has] been marginalized and isolated from the team and other employees."

222.    In her December 3, 2018 email, Duncan put her supervisors on notice that "since the same restrictions and limitations are not placed on other team members and since [she does] not have a performance issue or disciplinary finding that warrants this action – the following is discriminatory, retaliation, and in violation of Mr. Cooper's employment policies."

223.    In reference to the above email, one week later on December 10, 2018, Duncan received a request to meet at 1:00 pm with Titus and Jackson to discuss Duncan's email sent on December 3, 2018.

224.    At 12:56 pm Duncan received the written response to her email and had no time to read it before the meeting at 1:00pm with Titus and Jackson.

225.    Over the seven days that had passed since Duncan sent the initial email, at least two meetings were held in Titus' office to discuss the email and presumably how to respond.

226.    Duncan is aware of this because the meetings were added to Titus' and Jackson's public calendars and titled "Danielle Duncan email."

227.    These meetings were viewable to the QC team and Duncan's management chain at a minimum.

228.    At the meeting December 10, 2018, the tone was constructive, and Duncan's concerns were addressed, or so Duncan thought.

229.    However, when Duncan read the written response later that day and Duncan realized it was different than what had been discussed and inaccurate; thus, Mr. Cooper, through Titus and Jackson, said one thing but ended up following the information outlined in the email above.

230.    Duncan received a 1% raise, in February 2019, which was the most Duncan could make due to the salary cap from Duncan's demotion to a lower category position. Duncan would have been eligible for a raise of up to 3%, and would have been on her previous salary trajectory, in the position she was demoted from.

231.    Jackson treated Duncan differently than her other coworkers, when Duncan returned to work with an accommodation after taking medical leave for her anxiety.

232.    During this time, Jackson and other teams assigned deadlines evenly spread out as either 3, 5, or, 7-day deadlines.

233.    Duncan was only assigned 3-day deadlines which greatly increased the urgency of Duncan's workload.

234.    None of Duncan's colleagues were assigned exclusively 3-day deadlines.

235.    Also, during this time, Weyburn, constantly badgered Duncan to identify when Duncan would return to work in the office despite Duncan's doctor's certification of Duncan's need to work at a different location, which was given to Duncan in month by month increments.

236.    On or about August 1, 2019, Duncan was constructively discharged due to the severe and pervasive hostile work environment Duncan was subject to over the years at Mr.

Cooper. Duncan was subject to increasing scrutiny and hostility from management, increasing isolation by her peers, demotion in title and job responsibilities, and decreased earning potential.

237.    Prior to August 1, 2019, working for Mr. Cooper subjected Duncan to a harmful environment with such a high degree of emotional stress that Duncan lost sleep and lost all her hair.

## VI.    Conclusion

238.    Mr. Cooper is complacent with errors and deficiencies in its internal processing system which allow it to reap additional profit from consumers and government payors.

239.    Mr. Cooper benefits from this system as it creates artificially high loan balances through higher interest accrual amounts, along with other invalid charges, forcing consumers to pay more than they legally should be required to.

240.    In the event a home is foreclosed or sold for the less than the outstanding loan balance or an ineligible loan is assigned to HUD, these improper charges will be shifted to the government through the FHA system.

241.    This constitutes fraud against the government in violation of the False Claims Act.

242.    Duncan has a disability, utilized her FMLA rights, and made protected disclosures in an effort to stop fraud against the government, discrimination, and retaliation.

243.    Duncan was subject to increased scrutiny, demoted, issued false disciplinary notices, was subject to a hostile work environment, and constructively discharged in retaliation for raising concerns that Mr. Cooper's practices defrauded the government, for having a disability, for taking FMLA leave, for requesting and receiving reasonable accommodations under the Americans with Disabilities Act, and for reporting discrimination based on her medical leave and perceived disabilities.

## COUNT I
### Violations of the False Claims Act
### 31 U.S.C. § 3729(a)(1)(A)

244.    Duncan incorporates all of the allegations set forth in the foregoing paragraphs as though fully alleged herein.

245.    The False Claims Act imposes liability on any persons who knowingly present or cause to be presented a false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a)(1)(A).

246.    Mr. Cooper knowingly presented or caused to be presented claims to the government to obtain falsely inflated payment for FHA insured home loans which were foreclosed and through which the foreclosure did not make Mr. Cooper whole again.

247.    The result of Mr. Cooper's actions has led the United States Government to pay for falsely inflated interest on foreclosed homes.

248.    The United States of America has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws and regulations in an as of yet undetermined amount.

## COUNT II
### Violations of the False Claims Act
### 31 U.S.C. § 3729(a)(1)(B)

249.    Duncan incorporates all of the allegations set forth in the foregoing paragraphs as though fully alleged herein.

250.    The False Claims Act imposes liability on any persons who knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim.  31 U.S.C. § 3729(a)(1)(B).

251.    Mr. Cooper knowingly made or caused to be made a false record or statement to a false claim when it:

     a.   Allowed documents and the internal tracking systems to delay posting the date loan payments were received in a manner that resulted in falsely higher interest on FHA insured home loans; permitted a lack of sufficient controls and internal QC programs.

     b.   Continued utilizing these false documentation to increase the amount consumers were required to pay on their home loans; this in turn would continue accruing and in the event the home was foreclosed without collecting the entirety of the outstanding loan amount, the government would cover the outstanding balance.

252.    The result of Mr. Cooper's actions has led the United States Government to pay for artificial and unnecessary loans, for which Mr. Cooper received payments from the FHA.

253.    The United States of America has been damaged by all of the aforementioned misrepresentations and failures to comply with requisite laws and regulations in an as of yet undetermined amount.

## COUNT III
### Violations of the False Claims Act
### 31 U.S.C. § 3729(a)(1)(G)

254.    Duncan reasserts and incorporates by reference all paragraphs set forth above as if restated herein.

255.    Mr. Cooper knowingly and improperly avoided an obligation to transmit money to the Government in violation of 31 U.S.C. § 3729(a)(l)(G) when Mr. Cooper intentionally failed to repay and reissue thousands of dollars in monies that it owes to the FHA.

256.    Mr. Cooper received and kept payments from the United States of America through its illegal submissions to the FHA when monies should have been reissued and returned to the FHA.

257.    The United States of America has been damaged by all of the failures to comply with requisite laws and regulations in an as of yet undetermined amount. Mr. Cooper knowingly kept FHA monies that Mr. Cooper was not entitled to.

258.    Mr. Cooper was aware of its non-compliant practices, from Duncan's disclosures as early as in or around July 2017, and has not taken action to accomplish compliance, which would substantially reduce Mr. Cooper's profits.

## COUNT IV
### Violations of the False Claims Act
### 31 U.S.C. § 3730(h)

259.    Duncan incorporates the allegations set forth in foregoing paragraphs as though fully alleged herein.

260.    The False Claims Act provides that an employee may not be discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee in furtherance of any effort to stop the submission of one or more False Claims.

261.    Duncan engaged in protected activity under the False Claims Act by, among other ways, her numerous e-mails (referenced above) to her supervisors, Mr. Cooper's Human Resources, and Mr. Cooper's General Counsel concerning the fraudulent loan accounting practices at Mr. Cooper.

262.    Mr. Cooper had knowledge of Duncan's protected activity.

263.    Following Duncan's protected activity, Mr. Cooper harassed Duncan in the performance of Duncan's job duties, subjected Duncan to increased scrutiny and impossible deadlines, isolated Duncan, reversed Duncan's work, treated Duncan differently than her coworkers, made baseless accusations against Duncan, and harmed Duncan financially by withholding her reasonable accommodation request.

264.    Following Duncan's protected activity, Duncan was subject to such extreme, pervasive, and intense retaliation and harassment that she was constructively discharged.

265.    The False Claims Act provides that Duncan is entitled to two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including, as is most relevant to this instant matter, litigation costs and reasonable attorneys' fees.

### COUNT V
### Violations of the Family Medical Leave Act
### 29 U.S.C. § 2615.

266.    Duncan incorporates the allegations set forth in foregoing paragraphs as though fully alleged herein.

267.    Duncan had a right under the FMLA to take twelve (12) work weeks of leave during any twelve (12) month period for a serious health condition.  29 U.S.C. § 2612(a)(1)(D).

268.    Duncan engaged in protected activity under the FMLA from February 2017 until Duncan returned to work in May 2017. Duncan continued to take legally protected intermittent leave under the FMLA until February 2, 2018.

269.    Duncan exercised her right under the FMLA to take leave.

270.    Duncan suffered an adverse action in May 2017, when Mr. Cooper informed Duncan she would be put in a cubicle separate from the rest of Duncan's team, was demoted,

was told that she would not be getting her original job back, was told that Mr. Cooper had "moved on" and was told "we can't have you limping around."

271.    Mr. Cooper continued to retaliate and discriminate against Duncan by creating a hostile environment that exacerbated Duncan's anxiety, a condition Mr. Cooper was aware of.

272.    Duncan experienced such a high degree of emotional stress that Duncan lost sleep and lost all her hair.

273.    Duncan has been damaged as a result of the unlawful acts of Mr. Cooper.


## COUNT VI
## Violations of the Americans with Disabilities Act
### (Discrimination)
### 42 U.S.C. § 12101 *et seq*.

274.    Duncan incorporates the allegations set forth in foregoing paragraphs as though fully alleged herein.

275.    The Americans with Disabilities Act prohibits discrimination against people with disabilities in a variety of settings, including employment.

276.    In or around February 2017, Duncan was involved in a serious home accident; Duncan informed Mr. Cooper of this accident as soon as Duncan possibly could, from her hospital bed.

277.    In April 2017, Duncan had knee surgery to repair her meniscus and anterior cruciate ligament but continued to have noticeable difficulty walking and had difficulty walking up and down stairs. Duncan's injuries qualify as a disability under the ADA as her knee injury substantially limited her ability to complete activities such as walking and climbing stairs.

278.    Subsequent to Duncan's disability, Moore and Anderson moved Duncan out of her senior role to a more junior role. Additionally, Duncan was structurally isolated from her colleagues and her desk was moved further away from colleagues without Duncan's consent.

279.    On or about May 30, 2017, Anderson told Duncan that Duncan would not be getting her original job back and that Mr. Cooper had "moved on" and Duncan was not needed in the Senior Analyst role anymore.

280.    Anderson also told Duncan that "we can't have you limping around to FLOD meetings" at Mr. Cooper, a direct reference to Duncan's injury.

281.    Duncan was also the victim of false allegations and rumors.

282.    Duncan has been damaged as a result of Mr. Cooper's discriminatory actions.

### COUNT VII
### Violations of the Americans with Disabilities Act
### (Retaliation)
### 42 U.S.C. § 12101 *et seq.*

283.    Duncan incorporates the allegations set forth in foregoing paragraphs as though fully alleged herein.

284.    The Americans with Disabilities Act protects people with disabilities from retaliation for exercising their rights under the law.

285.    In or around February 2017, Duncan was involved in a serious home accident; Duncan informed Mr. Cooper of this accident as soon as Duncan possibly could, from her hospital bed.

286.    In April 2017, Duncan had knee surgery to repair her meniscus and anterior cruciate ligament but continued to have noticeable difficulty walking and had difficulty walking up and down stairs.

287.    Subsequent to Duncan's disability, Moore and Anderson moved Duncan out of her senior role to a more junior role. Additionally, Duncan was structurally isolated from her colleagues and her desk was moved further away from colleagues without Duncan's consent.

288.    On or about May 30, 2017, Anderson told Duncan that Duncan would not be getting her original job back and that Mr. Cooper had "moved on" and Duncan was not needed in the Senior Analyst role anymore.

289.    Anderson also told Duncan that "we can't have you limping around to FLOD meetings" at Mr. Cooper, a direct reference to Duncan's injury.

290.    Duncan was also the victim of false allegations and rumors.

291.    Duncan attempted to challenge these discriminatory practices by reporting to the proper channels at Mr. Cooper, but all her efforts resulted in no change to the discrimination she experienced.

292.    Duncan experienced retaliation after her disclosures as Mr. Cooper changed her title changed to Quality Control Senior Associate. This position was a demotion as this role was lower, while Duncan's previous role was a more senior role.

293.    Duncan has been damaged as a result of Mr. Cooper's retaliatory actions.

### COUNT VIII
### Violations of the Americans with Disabilities Act
### (Hostile Work Environment)
### 42 U.S.C. § 12101 *et seq.*

294.    Duncan incorporates the allegations set forth in foregoing paragraphs as though fully alleged herein.

295.    The Americans with Disabilities Act prohibits subjecting an individual with disabilities to a hostile work environment in a variety of settings, including employment.

296.    In or around February 2017, Duncan was involved in a serious home accident; Duncan informed Mr. Cooper of this accident as soon as Duncan possibly could, from her hospital bed.

297.    In April 2017, Duncan had knee surgery to repair her meniscus and anterior cruciate ligament but continued to have noticeable difficulty walking and had difficulty walking up and down stairs.

298.    Subsequent to Duncan's disability, Moore and Anderson moved Duncan out of her senior role to a more junior role. Additionally, Duncan was structurally isolated from her colleagues and her desk was moved further away from colleagues without Duncan's consent.

299.    On or about May 30, 2017, Anderson told Duncan that Duncan would not be getting her original job back and that Mr. Cooper had "moved on" and Duncan was not needed in the Senior Analyst role anymore.

300.    Anderson also told Duncan that "we can't have you limping around to FLOD meetings" at Mr. Cooper, a direct reference to Duncan's injury.

301.    Duncan was also the victim of false allegations and rumors.

302.    Duncan attempted to challenge this hostile work environment by reporting to the proper channels at Mr. Cooper, but all her efforts resulted in no change to the hostility she experienced.

303.    Duncan has been damaged as a result of Mr. Cooper's hostile work environment, as she was constructively discharged due to the severe and pervasive environment of hostility toward Duncan present at Mr. Cooper.

## PRAYER FOR RELIEF

Wherefore, Relator Duncan, acting on behalf and in the name of the United States of America and on her own behalf, prays that judgment will be entered against Defendant Mr. Cooper Group Inc., for violations of 31 U.S.C. § 3729, *et seq.,* 31 U.S.C. § 3730(h), 29 U.S.C. § 2615 *et seq.*, and 42 U.S.C. § 12101 et seq. as follows:

a.  This Court enter judgment against Defendant in an amount equal to three (3) times the amount of damages the United States Government has sustained because of the Defendants' actions plus a civil penalty of $21,563 for each act in violation of 31 U.S.C. § 3729;

b.  In favor of Relator Duncan for awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d), including the costs and expenses of this action and reasonable attorneys' fees;

c.  In favor of Relator Duncan for the maximum relief allowed under 31 U.S.C. § 3730(h)(2), including 2 times the amount of back pay, interest on the back pay, and compensation for special damages sustained as a result of the retaliation, including litigation costs, expert witness fees, and reasonable attorneys' fees;

d.  Duncan be awarded such legal or equitable relief as will effectuate the purposes of the FMLA, including, but not limited to economic damages, liquidated damages, reasonable attorney's fees and costs, pre-judgment interest;

e.  Duncan be awarded such legal or equitable relief as will effectuate the purposes of the Americans with Disabilities Act, including, but not limited to economic damages, liquidated damages, reasonable attorney's fees and costs, pre-judgment interest;

f.  The United States Government and Relator Duncan be awarded all other relief, both in law and equity, to which they are reasonably entitled.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator Duncan hereby demands a jury trial.

July 20, 2021                              Respectfully Submitted,


                                          */s/ Mark T. Hurford*_____
                                          Mark T. Hurford (DE No. 3299)
                                          Campbell & Levine, LLC
                                          222 Delaware Ave Suite 1620,
                                          Wilmington, DE 19801
                                          (302) 426-1900
                                          mhurford@camlev.com

                                          R. Scott Oswald (admitted *pro hac vice*)
                                          Janel Quinn (admitted *pro hac vice*)
                                          The Employment Law Group, P.C.
                                          1717 K Street, NW, Suite 110
                                          Washington, D.C. 20006
                                          (202) 261-2813
                                          (202) 261-2835 (facsimile)
                                          soswald@employmentlawgroup.com
                                          jquinn@employmentlawgroup.com

                                          Attorneys for *Qui Tam* Relator